# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

AUCTION MANAGEMENT
SOLUTIONS, INC.,

    Plaintiff,

v.

MANHEIM AUCTIONS, INC. et al.,

    Defendants.

CIVIL ACTION NO.
1:05-CV-0639-RWS

## **ORDER**

This case is before the Court on Defendant Manheim Auctions' Motion for Summary Judgment on Counts Two Through Six [466]. After considering the entire record, the Court enters the following Order.

## I. Background[1]

Defendant Manheim Auctions, Inc. ("Manheim") is a wholesale auction company, which re-markets vehicles for other individuals and entities (collectively, "consignors") that wish to sell vehicles that they own. Manheim

---

[1] The facts as stated herein are drawn from the Complaint, and from Plaintiff's Response to Defendant's Statement of Material Facts [466-2]. The Court makes no official findings with regard to these facts.

sells consignors' vehicles to licensed franchise and independent auto dealers (collectively, "dealers"). From 2000 to 2003, Manheim operated more than eighty auction houses in the United States. Each Manheim auction house is a separate corporation managed by a General Manager or an Auction Manager. A Manheim auction house features multiple "lanes" in which vehicles are sold.

Plaintiff Auction Management Solutions, Inc. ("AMS") is the vendor of a product called OnLine Ringman. OnLine Ringman is software that allows remote bidders to participate in a live auction taking place at an auction house. The software broadcasts audio, video, and bidding-related information over the internet simultaneous with live auction action and permits internet users to bid in the auction. AMS markets and licenses OnLine Ringman to auction houses which pay AMS fees. Besides auction houses, AMS has no other customers for OnLine Ringman.

Before using OnLine Ringman, an auto auction house must set up equipment in an auction lane, including computers with OnLine Ringman software installed on them and network the computers to AMS's computer system. To conduct an auction event using OnLine Ringman, the auction house must, among other things, transfer data to AMS about the cars being auctioned

2

and notify dealers that they can participate in the event online as well as in person.  AMS does not, and did not, advertise particular OnLine Ringman auction events, nor does it advertise OnLine Ringman directly to auto dealers bidding in auctions.  AMS has maintained a policy of not coming between the auction house and the bidders, instead making its auction house customers responsible for marketing their use of OnLine Ringman.

In September 2002, AMS obtained a registered logo service mark for OnLine Ringman.[2]  In registering this mark, AMS represented that "[n]o claim [was] made to the exclusive right to use 'RINGMAN,' apart from the mark as shown."  (See [466-3] Ex. 13.)  The trademark examiner also found "RINGMAN" to be a descriptive term, describing the auctioneer's assistant who accepts the bids and reports them to the head auctioneer.  (See [466-3] Ex. 6.)  AMS further represented to the examiner that "no one viewing the mark would misunderstand that the word portion of the composite mark of the present application as being exclusively appropriated by itself apart from the composite."  Id.

---

[2]For an image of the mark, see Def.'s Br. in Supp. of Mot. for Summ. J. [466-2] at 4.  The mark depicts the words "ONLINE RINGMAN" with a line drawn underneath the words and a spherical ring diagonally surrounding the words.

Manheim never licensed OnLine Ringman on a companywide basis. It permitted its auction houses to decide individually whether to use the software. Of the eighty houses, eleven of them elected to do so for varying periods of time ranging between March 2001 and August 2003. Since August 2003, it appears that no Manheim auction house in the United States has used OnLine Ringman. Each Manheim auction house that used the software was responsible for advertising its own events using that product. Manheim's corporate office had no involvement in this advertising, as each auction house is a wholly owned subsidiary. AMS does not allege any improper marketing by nine of the eleven Manheim auction houses that utilized OnLine Ringman. AMS's trademark infringement and unfair competition claims rest solely on marketing performed by two Manheim auction houses: Manheim Auto Auction ("MAA") and Portland Auto Auction ("PAA").

The record shows that MAA used OnLine Ringman in six of its twenty-six auction lanes between May 2001 and July 2003. In the spring of 2003, MAA began to use Manheim's Simulcast system consistently in its remaining lanes to permit remote bidding in its live auctions. Initially, MAA advertised its OnLine Ringman sales through direct mail or telemarketing to auto dealers.

4

Around June 2002, MAA created electronic newsletters called "eNews Bulletins" to notify dealers of MAA's upcoming online auction events. MAA emailed eNews Bulletins to a distribution list that it claims to have created, composed mainly of dealers including Brian Hardway, AMS's program manager for Manheim auction houses.

MAA advertised OnLine Ringman auction events in eNews Bulletins using several different terms, including "Ringman Simulcasts", "simulcasts*" (with a footnote from the asterisk stating that the event was "Powered by OnLine Ringman"), and "Simul-sales." MAA used the term "simulcast" to describe a type of sale in which a live auction was simultaneously broadcast to remote participants who could participate in the live auction, thus using the term in accordance with its dictionary definition. See, e.g., Webster's II New College Dictionary 1029 (2001).

AMS does not appear to have expressed any concerns about the eNews Bulletins but instead encouraged MAA to share its marketing techniques with other AMS customers (other auction houses). On one occasion, Mr. Ron St. Denis of MAA was contacted by Hardway who emailed: "Can we brand the OnLine Ringman sales?" Hardaway suggested adding "Powered by OnLine

5

Ringman" to the eNews bulletins. St. Denis directed MAA personnel to follow Hardaway's instructions, copying Hardaway on his email. Later that day, however, Hardaway retracted his request, stating that AMS only used the "Powered by OnLine Ringman" phrase with those customers who licensed an upgraded system, which MAA did not have.

PAA used OnLine Ringman in one of its six auction lanes from May 2001 until March 2003. For an indeterminate period after PAA began to use Manheim's Simulcast system in 2003 and prior to June 2004, one web page on PAA's website carried the header "GM Online Ringman" and, lower on that page, stated, "SIMULCAST is here!!! - Better audio and video . . . Better Condition Reports . . . Faster Connection . . .Simulcast is available through Manheim Online [www.manheim.com]!"

AMS personnel viewed this PAA web page while it was still active, but there is no evidence that AMS customers or prospective customers viewed the web page. AMS's Hardway admits that he shared PAA's web page format with other Manheim auction houses that used OnLine Ringman, and he cited PAA's website to other AMS customers on at least three occasions as an example of how properly to market the program.

6

Around August 2002, Manheim introduced the Manheim Simulcast system, which also permitted remote bidders to participate in live auctions held at Manheim auction houses. Unlike OnLine Ringman, it was integrated into Manheim's IBM mainframe computer operating system and offered additional features that facilitated auction events for Manheim auction houses even if they were not broadcast to remote bidders. IBM developed this software, and IBM had also developed similar remote bidding software for another auction company, based on two pieces of software code it had previously developed jointly with Manheim. A Manheim employee who had never seen AMS's OnLine Ringman software worked with IBM to develop the Simulcast system, without seeking input from other Manheim personnel.

Deposition testimony shows that the Simulcast system permitted remote bidding but did not include software to capture audio and video at an auction site and transmit it over the internet to remote bidders. Manheim considered using AMS as a software vendor for their newly developed product, but decided to use Live Global Bid instead since AMS's software was written in a different programming language than Manheim's and was incompatible with Manheim's mainframe computer system. Deposition testimony also shows that Manheim

7

has not sought and does not seek to license its Simulcast system to other auction houses, although Manheim does license its entire operating system, which includes Manheim Simulcast as a component, to two auction companies.

During the seven month period in which MAA used both Manheim's Simulcast system and OnLine Ringman, no one from AMS asked MAA to change any of its marketing. MAA and PAA ended their marketing of OnLine Ringman at their own initiative, without knowing that anyone from AMS purportedly believed that their marketing of the service was improper. The record shows that MAA distributed its last eNews Bulletin advertising an OnLine Ringman auction event in July 2003 and that PAA's web page containing the phrases "GM Online Ringman" and "SIMULCAST is here" was last active in June 2004.

AMS filed suit against Manheim, alleging in the Complaint five counts of trademark infringement and unfair competition. Currently before the Court is Manheim's Motion for Summary Judgment on Counts Two Through Six. [466].

**II. Discussion**

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and

8

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (stating that once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts"). With this standard as a foundation, the Court turns to address the merits of Defendants' Motion for Summary Judgment [466].

## A. Evidence of Wrongful Conduct

First, Defendant claims there is no evidence that Manheim or its auction houses engaged in any wrongful conduct. Manheim claims that AMS has no

10

evidence that MAA or PAA engaged in any conduct that could amount to trademark infringement or unfair competition and that even if AMS could make this predicate showing, there is no evidence from which a reasonable jury could find that MAA or PAA's marketing caused a likelihood of confusion. It is on these grounds that Manheim moves for summary judgment on AMS's claims for trademark infringement and unfair competition.

AMS alleges trademark infringement under both Section 43(a) of the Lanham Act and under the common law based on two separate types of wrongful acts by Manheim. First, AMS claims that Manheim improperly used both a confusingly similar variant of AMS' design mark ONLINE RINGMAN, as well as its word mark ONLINE RINGMAN and RINGMAN in various forms - including GM ONLINE RINGMAN, RINGMAN, and RINGMAN SIMULCAST - to identify Manheim's online auction system. Second, AMS alleges unfair competition and deceptive trade practices based on Manheim's allegedly improper use of its own trademark SIMULCAST in association with AMS' online auction system. AMS's state law claims rise and fall with its federal claims. See, e.g., Optimum Techs. V. Home Depot U.S.A., 217 Fed. Appx. 899, 902 (11th Cir. 2007).

11

In the Eleventh Circuit, a plaintiff alleging trademark infringement must show both unauthorized use of the mark in commerce and a likelihood of confusion caused by the use. Davidoff & CEI, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300-01 (11th Cir. 2001). AMS alleges that Manheim used AMS's marks to promote and market the Manheim Simulcast system, but they identify only three instances in which Manhheim allegedly misused AMS's registered mark.

The record shows that AMS disclaimed exclusive rights to the individual term "ringman." Yet AMS now alleges that Manheim committed trademark infringement by using this portion of the composite mark, and because of this undisputed fact, the Court concludes that Plaintiff's claim of infringement with regard to the two instances where Manheim utilized the term "ringman" ultimately fails.[3]

In the third instance the Plaintiff raises, Defendant used the phrase "GM Online Ringman" on PAA's website but had "simulcast" listed at the bottom. While this may be a potential misuse, Plaintiff has not offered evidence of any

---

[3]AMS does complain of a lack of documentation of advertising practices during the period when PAA and MAA were utilizing both auctioning systems, but it is Plaintiff's burden to show inappropriate use of the marks.

12

confusion occurring as a result of this misuse. Further, it is very unlikely that any confusion would have taken place, since a user would immediately know the difference between the products when he or she pulled up the web page.[4]

The Court further concludes that Plaintiff has not met its burden by showing any evidence at all of reverse passing off or false designation of origin. While it does appear from the record that Manheim used both software programs, and hence both marks, at the same time, there is no evidence that Manheim misused any of AMS's marks or falsely designated either product.

Additionally, the Court concludes that AMS's common law trademark infringement claims lack legal basis. AMS does not claim exclusive rights to the term "Ringman Simulcast," and even if AMS did have rights in such a mark, Manheim's use of the term "simulcast" to refer to its own product does not constitute infringement. It is well established that "[a] trademark cannot be infringed by the generic term for the product it designates." Small Bus. Assistance Corp. V. Clear Channel Broad., Inc., 210 F.3d 278, 279 (5th Cir. 2000). The Trademark Office has stated that the term "simulcast" is generic and therefore cannot distinguish a particular company's services. (See [466-3]

---

[4]See infra for more discussion of the lack of a likelihood of confusion.

13

Ex. 6.) Manheim's use of "simulcast" to describe its service is therefore proper, as it identifies the general type of service that is offered. Id.

The Court also concludes that the complained-of marketing created no likelihood of confusion. Even if AMS had evidence that Manheim engaged in conduct that could amount to infringement of a federally registered mark, reverse passing off, passing off, or infringement of a common law mark, AMS would need to make a further showing that the particular challenged conduct created a likelihood of confusion among relevant consumers. See Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1314 (11th Cir. 2001) (likelihood of confusion among relevant consumers is an "essential element" of trademark and unfair competition claims). A likelihood of confusion exists when confusion is probable and is experienced by an actual or potential consumer. Packman v. Chicago Tribune Co., 267 F.3d 628, 645 (7th Cir. 2001).

Generally, courts consider seven factors in evaluating a likelihood of consumer confusion: "(1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." Lipscher, 266 F.3d at 1313. Actual confusion is "the most

14

important single factor." Safeway Stores, Inc. V. Safeway Disc. Drugs, Inc., 675 F.2d 1160, 1166 (11 th Cir. 1982). Therefore, it is "the best evidence of likelihood of confusion." John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 978 (11th Cir. 1983).

After reviewing the entire record, the Court concludes that AMS has failed to show evidence of a likelihood of confusion. They do not present studies or surveys assessing confusion, and they have not alleged that there are any customers or prospective customers who have experienced any potential confusion at any time since the introduction of Manheim's Simulcast system. It is particularly worth noting that the customers at issue here - auction houses - are sophisticated commercial actors that make significant investments in time and resources to use these types of products. Additionally, Manheim has never sought to license its Simulcast system to competing auction companies, nor did they target their marketing to other auction companies. Other auction companies are Manheim's competitors, not their customers. Finally, Manheim has presented evidence that AMS's customers were not in fact confused by the complained-of terminology and marketing. In conclusion, even if AMS had

15

shown a likelihood of confusion exists, they have failed to demonstrate that such confusion was caused by the complained-of marketing.

Based on the absence of any evidence of wrongful conduct or likelihood of confusion, Manheim's Motion for Summary Judgment on Counts Two Through Six is due to be **GRANTED**.

## B. Estoppel[5]

Further, Defendant claims that even if AMS did have evidence of wrongful conduct, AMS should be estopped from asserting its trademark and unfair competition claims because AMS was aware of all the marketing activities on which it bases its claims and failed to object to those activities. Manheim alleges that AMS never notified it or any of its auctions that MAA's or PAA's marketing practices were improper. Indeed, Manheim has shown that AMS praised Manheim's marketing and used MAA's marketing model in particular as a model for AMS's other customers. AMS has not shown any evidence to the contrary.

---

[5] For purposes of thoroughness, the Court will address the other arguments raised with regard to Defendant's Motion. Sections II.B. and II.C. assume arguendo that Plaintiff could prove both an unauthorized use of a mark and likelihood of confusion.

16

"Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of its mark." Bd. Of Regents v. Buzas Baseball, Inc., 176 F. Supp. 2d 1338, 1347(N.D. Ga. 2001). It has three elements: "(1) the senior user actively represented that it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." Id.

Here, AMS appears to have failed to complain about MAA and PAA's marketing while it was occurring and instead affirmatively encouraged them to share their marketing practices with other AMS customers. However, AMS does not appear to have actively represented that it would not assert a right or claim with regard to its mark or its software. Although AMS failed to object to purportedly improper marking, it did not legally acquiesce, and Defendant's argument on this point must fail.

## C. Injunctive and Monetary Relief

Finally, Defendant argues that AMS's claims for injunctive relief are moot because the complained-of marketing has long since ceased with no threat of recurrence, and that AMS cannot meet its burden to obtain an accounting for

17

profits because there is no evidence that MAA or PAA engaged in any willful misconduct or that there ws any loss of sales as a result.

First, Defendant asserts that AMS's request for injunctive relief is mooted because MAA and PAA voluntarily ceased the complained-of activity before AMS filed its Complaint in this action and there is no possibility that they will resume such activity. See Organizational Techs., Inc. V. Dun & Bradstreet Corp. Found., No. 96 Civ. 5178, 1997 WL 599412, at *3 (S.D.N.Y. Sept. 26, 1997) ("An injunction barring future infringement of a mark is not warranted when there is no reason to believe that such future infringement will occur. . . There is no need for an injunction to curtail behavior that shows no sign of recurring."). AMS's sole contention for the need for an ongoing injunction is that Defendant is continuing to infringe on its common law mark by using the term "simulcast." As discussed above, however, the Court concludes that Manheim's use of the term "simulcast" is in no way improper but instead describes the genre of service. The Court therefore concludes as a matter of law that Plaintiff is not entitled to injunctive relief.

Finally, Defendant claims that the sole cognizable monetary relief AMS may seek with regard to its trademark and unfair competition claims is an

18

accounting for profits. AMS's Complaint [1] does not request actual damages. Even if the Court were to allow AMS to amend to request such damages, Manheim contends that AMS is not entitled to such damages as a matter of law.

A plaintiff cannot obtain an accounting for profits unless it can establish that "(1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." <u>Optimum Techs.</u>, 217 Fed. Appx. at 902. Defendant contends that Plaintiff cannot make such a showing. As discussed above, Plaintiff has not demonstrated that Defendant willfully or deliberately misused any mark or engaged in improper marketing. Plaintiff has also failed to demonstrate any unjust enrichment. <u>Id.</u> at 903 (holding that there is no evidence of unjust enrichment where plaintiff had "no evidence that any of [the defendant's] sales of [the product or service at issue] are attributable to its alleged infringement of [the plaintiff's] mark."). And finally, Plaintiff has not put forth any evidence of conduct by Manheim, MAA, or PAA that would warrant awarding AMS profits under a deterrence theory. <u>Id.</u> (holding that an accounting is not necessary to deter future conduct where there was "no evidence that [the defendant] was improperly using [the plaintiff's] mark to its financial advantage"). Because the undisputed facts

19

show that AMS is not entitled to the monetary relief it seeks on its trademark and unfair competition claims, summary judgment shall be **GRANTED**.

**D. Attorneys Fees and Costs**

The Court finds that the circumstances of this case do not make it an "exceptional case" in which the Lanham Act permits a court to award reasonable attorney fees to the prevailing party. Thus, the Court declines Defendant's invitation to award such fees.

**III. Conclusion**

In Conclusion, Defendant Manheim's Motion for Summary Judgment on Counts Two Through Six is hereby **GRANTED** and the claims asserted in Counts Two through Six are **DISMISSED**.

**SO ORDERED**, this  30th  day of September, 2008.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE