# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

AUCTION MANAGEMENT
SOLUTIONS, INC.,

        Plaintiff,

    v.

MANHEIM AUCTIONS, INC., et
al.,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:05-CV-0639-RWS

## ORDER

    This case is before the Court on Defendant Live Global Bid's Motion for

Summary Judgment of No Inducement of Infringement Based on Any Direct

Infringement by Manheim [562], Defendant Manheim's Motion for Summary

Judgment [572], Plaintiff Auction Management Solutions' Motion for Summary

Judgment [574], and Defendant Manheim's Motion for Summary Judgment of

Invalidity of AMS's '612 Patent Under 35 U.S.C. § 102(b) and

Unenforceability of AMS's '612 Patent Due to Inequitable Conduct [602].

After considering the entire record, the Court enters the following Order.

**I. Background**[1]

On March 8, 2005, Auction Management Solutions, Inc. (hereinafter "AMS") filed suit against Manheim Auctions, Inc. (hereinafter "Manheim") alleging, <u>inter alia</u>, infringement of U.S. Patent No. 6,813,612 (hereinafter "the '612 Patent") associated with the OnLine Ringman system. These are the only two parties remaining at this point in the litigation, and the patent infringement claim is the only one remaining in the case. <u>See</u>, Order of Sept. 30, 2008 [Dkt. No.628].

Plaintiff AMS is the vendor of a product called OnLine Ringman, which is essentially an embodiment of the '612 Patent. OnLine Ringman is software that allows remote bidders to participate in a live auction taking place at an auction house. The software broadcasts audio, video, and bidding-related information over the internet simultaneous with live auction action and permits internet users to bid in the auction. AMS markets and licenses OnLine Ringman to auction houses, which pay AMS fees. Before using OnLine

---

[1]The Court makes no findings with regard to the facts as stated herein, but merely provides a factual background of the case drawn primarily from Plaintiff's Complaint [1] and Plaintiff's various responses to statements of undisputed material fact submitted with Defendant's motions for summary judgment.

Ringman, an auto auction house must set up equipment in an auction lane, including computers with OnLine Ringman software installed on them and network the computers to AMS's computer system. To conduct an auction event using OnLine Ringman, the auction house must, among other things, transfer data to AMS about the cars being auctioned and notify dealers that they can participate in the event online as well as in person. AMS has maintained a policy of not coming between the auction house and the bidders, instead making its auction house customers responsible for marketing their use of OnLine Ringman.

Defendant Manheim is a wholesale auction company, which re-markets vehicles for other individuals and entities (collectively, "consignors") that wish to sell vehicles that they own. Manheim sells these consignors' vehicles to licensed franchise and independent auto dealers. Around August 2002, Manheim introduced the Manheim Simulcast System (hereinafter "Simulcast"), which also permitted remote bidders to participate in live auctions held at Manheim's auction houses. Unlike OnLine Ringman, it was integrated into Manheim's IBM mainframe computer operating system and offered additional features that facilitated auction events for Manheim auction houses even if they

3

were not broadcast to remote bidders.  A Manheim employee who had never

seen AMS's OnLine Ringman software worked with IBM to develop Simulcast,

without seeking input from other Manheim personnel.  Simulcast is essentially a

computerized  system that Manheim uses to facilitate its auctioning of vehicles.

It can be used to broadcast a live Manheim auction to remote users who can

place bids on the vehicles being auctioned.  The Simulcast system includes a

Bidding System and an Audio/Video System.  The Bidding System handles all

data for Simulcast other than audio, video, and image data and transmits data

about the auction of an item to and from remote bidders and remote sellers.

In its suit against Manheim, Plaintiff AMS alleged that Manheim's

Simulcast System infringed on the '612 Patent.  Currently before the Court are

the motions for summary judgment by AMS and Manheim listed above.

## II. Discussion

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

AO 72A
(Rev.8/82)

judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (stating that once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").  With this standard as a foundation, the Court turns to address the merits of the pending Motions for Summary Judgment.

**B. Manheim's Motions for Summary Judgment on Invalidity [Dkt. No. 572] and [Dkt. No 602]**

1. Manheim's Motion for Summary Judgment on Invalidity under 35 U.S.C. § 102(B) [602]

In its Motion for Summary Judgment on Invalidity, Manheim argues that AMS's '612 Patent is invalid and unenforceable due to the on-sale and public-

use bars under § 102(b). Manehim further alleges that earlier developmental versions of the software for the OnLine Ringman product render the '612 patent claims invalid as obvious under 35 U.S.C. §103.

A patent is invalid due to a public-use bar if more than one year before the filing of the earliest patent application (the "critical date") there is "any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." New Railhead Mfg., LLC v. Vermeer Mfg. Co., 298 F.3d 1290, 1297 (Fed. Cir. 2002). A patent is invalid due to an on-sale bar if two conditions are satisfied prior to the critical date: (1) the invention is "the subject of a commercial offer for sale," and (2) the invention is "ready for patenting." Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 67 (1998). "Ready for patenting" means that the invention is either reduced to practice or "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Id. at 67-68.

Whether an invention is ready for patenting is a question of law. Fujikawa v. Wattanasin, 93 F.2d 1559, 1564 (Fed. Cir. 1996). Whether an invention was in "public use" within the meaning of § 102(b) is also a question

7

of law. <u>Netscape Communications Corp. v. Konrad</u>, 295 F.3d 1315, 1320 (Fed. Cir. 2002). Whether an invention was "on sale" within the meaning of § 102 is, likewise, a question of law. <u>Scaltech, Inc. v. Retec/Tetra</u>, LLC, 269 F.3d 1321, 1327 (Fed. Cir. 2001). And finally, whether a patent is invalid as obvious is a question of law. <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 127 S.Ct. 1727, 1745-46 (2007).

Under the Supreme Court's two-part test applying 35 U.S.C. § 102(b), Manheim must show that (1) the invention of the '612 patent was ready for patenting before May 25,1999, and (2) before May 25, 1999, AMS made a public use or offer for sale of a product that meets the '612 claims.

### i. ready for patenting

AMS argues that many changes were made in the software's source code as it went through its developmental stage to the commercial product of May 26, 1999. The crux of AMS's argument is that changes were made to the OnLine Ringman source code on May 25, 1999 and May 26, 1999. Therefore, AMS argues, the claimed inventions must not have been ready for patenting before the critical date of May 25, 1999.

However, AMS fails to identify how these source code changes were necessary to allow the software to practice the claimed inventions. It is the claims, not the source code of AMS's ultimate product, that define the inventions and serve as the yardstick for when they first became "ready for patenting," thus triggering the public-use and on-sale bars. It is well settled that later refinements or improvements to a product do not permit the inference that the claimed inventions were not previously reduced to practice. See e.g., New Railhead Mfg., LLC v. Vermeer Mfg. Co., 298 F.3d 1290, 1297 (Fed. Cir 2002) (an invention may be ready for patenting "even though it may later be refined or improved"); Helifix Ltd. v. Blok-Lok, Ltd., 208 F.2d 1339, 1350 (Fed. Cir. 2000) ("[R]eduction to practice of the claimed method does not require reduction to practice of the specific tool described in the . . . patent, but merely requires the development of any tool that meets the limitations recited in the claim."); Barmag Barmer Machinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 838 (Fed. Cir. 1984) (explaining that "it is immaterial" that an embodiment "was a makeshift or 'Rube Goldberg' embodiment"). Furthermore, a claim is ready for patenting if "prior to the critical date the inventor[s] had prepared drawings or other descriptions of the invention that

AO 72A
(Rev.8/82)

were sufficiently specific to enable a person skilled in the art to practice the invention." Pfaff v. Wells Elec., Inc., 525 U.S. 55, 67 (1998). After reviewing the record, the Court concludes that the claimed inventions met the legal standard for being "ready for patenting" before the critical date in this case. Indeed, in one pertinent case, the Federal Circuit concluded that "actual completion of . . . software is not required, provided that there is a disclosure that is sufficiently specific to enable a person skilled in the art to write the necessary source code to implement the claimed method." Robotic Vision Systems, Inc. v. View Engineering, Inc., 249 F.3d 1307, 1311 n.2 (Fed. Cir. 2001).

Applying these legal standards to the facts of this case, the record shows that Claims 1 and 2 were ready for patenting when the OnLine Ringman System Requirements Document was written. There is evidence in the record showing that a person of ordinary skill in the art would not need anything besides this document to make a system embodying Claims 1 and 2 of the '612 patent. See Dep. of Paul Sper, [Dkt. No. 653] at 166-71. Indeed, a college freshman and independent contractor named Michael James wrote the OnLine Ringman software without any technical assistance from the named inventors or anyone

10

else, and he had only taken seven computer courses at a community college at

the time he wrote the software. Dep. of James, [Dkt. No. 650] at 56-57, 78-79,

109-10, 236-37, 268-69. <u>See also</u>, Dep. of Sper, [Dkt. No. 653] at 209, Dep. of

Rabenold, [Dkt. No. 656] at 748-50, 757-58, Dep. of Simmons,[ Dkt. No. 649]

at 302, 310-12, 318, 386-87. Thus the claims at issue here were ready for

patenting when the document was completed in July 1997.

    At the very latest, the inventions were ready for patenting when AMS

employee Michael James wrote the "version 1" OnLine Ringman software in

1998.[2] There is ample testimony and evidence in the record to establish that

this software was capable of performing each of the elements of Claims 1 and 2,

as interpreted by the Court in its claim construction. <u>See</u> Dep. of James, [Dkt.

No. 650] at 145-46 (testifying that version 1 contained "[t]he whole bid[ding]

infrastructure"); Dep. of Alexander, [Dkt. No. 654] at 204-07, 194 (testifying

---

    [2] By Spring of 1998, AMS employee Michael James had written a "prototype" version of OnLine Ringman, which the parties refer to as "version 1." <u>See</u> Dep. of James, [Dkt. No. 650] at 47-50, 149-51. There is some discrepancy between the parties over the use of the word "version" - but the Court concludes that because AMS is the party that originally referred to "version 1" and "version 2" in its responses to interrogatories, AMS will not be now heard to dispute the use of that term as it has previously agreed to apply it. "Version 2" appears to have come about after the critical date.

that Alexander was unaware of any particular element of claims 1 and 2 within his expertise that were not met by "version 1" of OnLine Ringman); Dep. of Kurt Madvig, [Dkt. No. 625] at 47-48, 50, 85-88, 119-27, 123-30, 146; Dep. of Millard Wolfgang, [Dkt. No. 609] at 9-16, 31-34, 54-55; Dep. of Alexis Jacobs, [Dkt. No. 645] at 8-9, 14-18, 23-24, 40-42, 47-51, 59-60. AMS can point to nothing in the record - not even the testimony of its own experts - that might indicate otherwise. For these reasons, the Court sees no genuine issue of material fact precluding a determination that the claimed inventions were ready for patenting before the critical date.

*ii. in public use*

The Court further finds no genuine issues of material fact with regard to whether AMS's invention was in public use before the critical date of May 25, 1999. The record shows that there was public use of the claimed invention in the Pennsylvania Auto Dealer's Exchange's (hereinafter "PADE") simulated sale on May 24, 1999.[3] This simulated auction preceded the first OnLine Ringman commercial auction by two days. During this simulation, PADE used

_____

[3] This sale further supports the Court's conclusion above that the claimed inventions were reduced to practice and ready for patenting before the critical date.

the same facility, the same equipment, and the same personnel - including the same auctioneer - on both days. PADE conducted this simulated auction after having conducted multiple prior mock auctions using OnLine Ringman that satisfied PADE's management that the system would work in a commercial auction. Moreover, AMS cannot identify any evidence in the record that would indicate that a single claim element of the '612 patent was not practiced in PADE's May 24, 1999 simulation.

Furthermore, the Court finds that the May 24, 1999 Simulated Sale was "public." Once the party challenging the validity of a patent establishes a prima facie case of public use, the burden shifts to the patentee to introduce evidence that the use was not "public" under § 102(b). Netscape, 295 F.3d at 1320. The Court concludes that Manheim has met its burden of establishing a prima facie case of public use through the evidence of the PADE simulation. In response, AMS contends that PADE's pre-critical-date uses of OnLine Ringman were not "public" because of a confidentiality provision in the AMS-ServNet agreement. The confidentiality provision states, however, that "the disclosing Party shall set forth such information in writing and identify it so by marking such information with an appropriate legend, marking, stamp, or positive written

13

identification on the face thereof to be proprietary." But there is no evidence in the record that the OnLine Ringman software PADE was using, nor the associated materials PADE provided to users carried a stamp or marking designating it as confidential. To the contrary, the record shows that PADE did not believe and was not told that its uses of OnLine Ringman were confidential.

Next, AMS argues that it controlled PADE's use of the claimed inventions. But although the source code was not revealed to PADE, the use of the software was not controlled or limited in any way. AMS had minimal control over PADE's uses of the OnLine Ringman software, extending only to ensuring that the servers were turned on and running. Indeed, here, as in Netscape, the patentee's "failure to monitor the use of his [software residing on a network], and failure to impose confidentiality agreements on those that used it was enough to place the claimed features of the patents in the public's possession." Netscape, 295 F.3d at 1323. Thus the Court concludes that AMS has failed to establish that the use of the claimed inventions was not public.

*iii. offered for sale*

Next, the Court shall address Manheim's contention that the claimed inventions were offered for sale before the critical date through offers to sell

14

OnLine Ringman version 1 and version 2.  A "commercial offer for sale" is "one which the other party could make into a binding contract by simple acceptance (assuming consideration)."  Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1048 (Fed. Cir. 2001).  A method claim is offered for sale when an offer to perform the method is made.  See Scaltech, Inc. v. Retec/Tetra, LLC, 269 F.3d 1321, 1328 (Fed. Cir. 2001).  See also, NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1320 (Fed. Cir. 2005).

AMS attempts to argue that the claimed inventions were not offered for sale before the critical date because the offers did not use the same verbiage as the claims of the '612 patent.  However, this argument ignores the legal principle that "there is no requirement that a sales offer specifically identify all the characteristics of an invention offered for sale or that the parties recognize the significance of all of these characteristics at the time of the offer."  Abbott Labs. v. Geneva Pharms., Inc., 182 F.3d 1315, 1319 (Fed. Cir. 1999).

Manheim points to several instances in which they contend AMS offered the invention at issue for sale prior to the critical date.  First, the record clearly shows that AMS executed a purchase order with Malibu Internet Services (hereinafter "Malibu"), agreeing to pay $180,000 to purchase software

15

embodying the claimed inventions several months before the critical date.  <u>See</u>
Dep. of Sper, [Dkt. No. 653] at 275-76, ex. 174; Dep. Of Alexander, [Dkt. No.
654] at 128; Dep of Simmons, [Dkt. No.] at 243.  Malibu and AMS were
separate entities having no overlap in ownership.

 With regard to this transaction, AMS argues that the law requires a sale
to a "third party" and that Malibu could not be a "third party" because its
principal, Mr. Paul Sper, is a named inventor and AMS hired Malibu to help
develop the OnLine Ringman software.  However, this assertion ignores the
legal precedent which clearly states that there is no exception for joint
developers; ". . . we have 'never recognized a 'joint development' exception to
the 'on sale' bar."  <u>Brasseler, U.S.A. I, LP v. Stryker Sales Corp.</u>, 182 F.3d 888,
890 (Fed Cir. 1999).  Here, AMS entered into a commercial agreement with a
subcontractor to purchase software meeting its listed specifications, for a set
price.

 The record also shows other agreements that AMS entered into, which
defined OnLine Ringman's features and capabilities and prices at which various
customers could use the system.  According to the record before the Court,

16

AMS offered their OnLine Ringman system for sale to ServNet and to First Union.

AMS argues that its agreement with ServNet was not an offer to sell the claimed inventions because the contract failed to state that there was a current OnLine Ringman that could be sold to or used by ServNet's members. Instead, the agreement stated that AMS would use its best efforts to develop the system in accordance with the specifications. However, this argument ignores the legal principle explained in Pfaff, where the Supreme Court held that a claimed invention was offered for sale under § 102(b) even though the device did not exist at the time of the offer and was not made until after the critical date. 525 U.S. at 57-59.

With regard to the alleged offer to sell use of the claimed method to First Union before the critical date, AMS argues that their actions did not constitute an offer to sell under § 102(b) because PADE received no extra compensation from First Union for using OnLine Ringman. However, it is clear from the record that PADE made a binding offer to multiple consignors, including First Union, to conduct an auction of their vehicles using OnLine Ringman. As explained above, an "offer for sale" under § 102(b) is defined by traditional

contract law principles. "Neither profit, revenue, nor even an actual sale is required for the use to be a commercial offer under section 102(b) - an attempt to sell is sufficient if it rises to an offer upon which a contract can be made merely by accepting it." <u>Atlanta Attachment Co. v. Leggett & Platt, Inc.</u>, 516 F3d 1361, 1365 (Fed. Cir. 2008). <u>See also</u>, <u>Scaltech, Inc. v. Retec/Tetra, LLC</u>, 269 F.3d 1321, 1328 (Fed. Cir. 2001) (method claim is offered for sale when an offer to perform the method is made). Because PADE made a binding commercial offer to conduct an auction for First Union using OnLine Ringman, which First Union could, and did, make into a contract by simple acceptance, there was an offer for sale of the claimed methods under § 102(b).

In conclusion, the Court finds no genuine issues of material fact with regard to whether AMS's invention was offered for sale before the critical date of May 25, 1999.

### iv. experimental use doctrine

In an attempt to avoid the conclusion that the offers to sell OnLine Ringman render its claims invalid under the on-sale bar, AMS invokes the experimental use doctrine. If, as here, there is prima facie evidence of an offer for sale, to negate an on-sale bar the patentee must present objective evidence

18

that "the sale was primarily for experimentation rather than commercial gain."

Electromotive Div. of General Motors Corp. v. Transportation Systems Div. of

General Elec. Co., 417 F.3d 1203, 1210 (Fed. Cir. 2005).  AMS baldly asserts

that it was selling a product it considered to be experimental, but this fails to

meet the legal standard for experimental use.  "[T]he question posed by the

experimental use doctrine . . . is not whether the invention was under

development, subject to testing, or otherwise still in its experimental stage at the

time of the asserted sale.  Instead, the question is whether the transaction

constituting the sale was not incidental to the primary purpose of

experimentation . . . ."  Id. at 1210.  AMS fails to provide any evidence that the

experimental use doctrine applies to any of their offers for sale, and thus the

Court concludes that the on-sale bar applies.

*v. § 103 requirement of non-obviousness*

Because the method was in public use and offered for sale before the

critical date, OnLine Ringman "version 1," as identified by the parties, may

serve as prior art for purposes of obviousness.   It is well-established that a sale,

offer to sell, or public use of a claimed invention prior to the critical date

constitutes prior art under § 102(b) bearing upon patentability.  Furthermore,

19

even a method or system that does not anticipate a claimed invention under §

102(b) serves as prior art through § 102(b) and may render a claim obvious

under § 103, if it was offered for sale, in public use, or described in printed

publication before the critical date. Dippin' Dots, Inc. v. Mosey, 476 F.3d

1337, 1344 (Fed. Cir.), cert. denied, 128 S.Ct. 391 (2007). The undisputed facts

establish that the "version 1" software is prior art under § 102(b) because it was

offered for sale before the critical date in this case. This prior art renders claims

1 and 2 obvious under § 103 because "version 2" was the one released on the

critical date, which AMS claims in the '612 patent. A claim is invalid under §

103 when, for example, it is only an obvious extension of what was offered for

sale or in public use prior to the critical date. Dippin' Dots, 476 F.3d at 1344.

Here, AMS cannot point to any changes from "version 1" to "version 2"

of OnLine Ringman for which the inventors were responsible. Instead, a

college freshman Michael James made all of the changes in the program over

the period of about one month, as an independent contractor. He changed the

networking protocol by himself, even admitting that the changes he made were

"sort of obvious to someone who's aware of the field." Dep. of James, [Dkt.

No. 650] at 287. These were the only differences between "version 1," which

was offered for sale and in public use, and "version 2," which is the subject of the '612 patent. Based upon the record, the Court finds that the changes that were made would have been obvious to a person of ordinary skill in this field.

Furthermore, AMS fails to raise any secondary considerations of nonobviousness that relate to the changes made between "version 1" and "version 2." It is well established that secondary considerations bear on obviousness only if the patentee shows they have a nexus to the differences between the prior art and the claimed invention. See, e.g., Ormco Corp. v. Align Technology, Inc., 463 F.3d 1299, 1311-12 & nn.13-14 (Fed. Cir. 2006); WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999) ("The patentee bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness."). The Court finds that the prima facie evidence of obviousness is quite strong and AMS has failed to present any persuasive evidence to challenge this conclusion.

For these reasons, the Court concludes that the claimed inventions are invalid under § 102(b) and § 103 because they were in public use and offered for sale, and they fail to meet the requirement of non-obviousness.

Consequently, the Court shall **GRANT** Manheim's Motion for Summary

Judgment of Invalidity [Dkt. No. 602].

<u>2. Manheim's Motion for Summary Judgment of Invalidity for</u>

<u>Failure to Satisfy 35 U.S.C. § 112 ¶ 1 [Dkt. No. 572]</u>

Even assuming *arguendo* that AMS could show that the '612 Patent was

valid under 35 U.S.C. § 102(b), the Court concludes that the '612 Patent would

still be invalid as to any TCP embodiment, for failure to satisfy 35 U.S.C. § 112

¶ 1 because it was not fully enabled and because AMS did not adequately

describe the inventions claimed. Manheim sets forth two main arguments in

their Motion for Summary Judgment of Invalidity of Plaintiff's '612 Patent for

Failure to Satisfy 35 U.S.C. § 112, ¶ 1 [Dkt. No. 572-3]. First, Manheim

contends that the claims in the '612 patent are not fully enabled because the

patent did not teach one of ordinary skill how to make and use a TCP

embodiment. Second, Manheim argues that the claims lack an adequate written

description because a person of ordinary skill in the art would not have

understood the original specification to show that the applicants had actually

developed, or were in possession of, a TCP embodiment.

22

*i. Enablement*

"The legal question of enablement involves an assessment of whether a patent disclosure would have enabled one of ordinary skill in the art at the time the application was filed to make and use the claimed invention without undue experimentation." Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1234 (Fed. Cir. 2003). The enablement requirement "demands that the patent specification enable those skilled in the art to make and use the full scope of the claimed invention without undue experimentation." Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc., 166 F.3d 1190, 1195 (Fed. Cir. 1999) (internal quotations omitted); see also, Sitrick v. Dreamworks, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008) ("The full scope of the claimed invention must be enabled."); Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc., 501 F.3d 1274, 1285 (Fed. Cir. 2007) ("[T]he specification must enable the full scope of the claims."). The requirement is satisfied "when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." AK Steel Corp. v. Sollac, 344 F.3d 1234, 1244 (Fed. Cir. 2003). "Whether a claim satisfies the enablement requirement of 35 U.S.C. § 112, ¶ 1 is a question of law," and where a specification fails to enable the full

23

scope of the claims, those claims are invalid as a matter of law. <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 481 F.3d 1371, 1377 (Fed. Cir. 2007).

In this case, AMS chose to pursue broad claims not limited to a particular network protocol so that Plaintiff could protect itself against infringement by systems using TCP or UDP. However, AMS's own expert -- Dr. Peter Alexander -- opines that the '612 patent's specification did not enable a system using the TCP protocol. Dep. of Alexander, [Dkt. No. 654] at 102, 107, 298-99. He further states that AMS was unsuccessful in making the claimed inventions using TCP and that it had to submit the UDP source code to the U.S.P.T.O. in order to enable the claims. <u>Id.</u>

The cases cited by Plaintiff on this issue are inapposite because they fail to address the fact that for the full scope of the claims to be enabled, there must have been an enabling disclosure of both embodiments -- here, reliable UDP and TCP embodiments. It is well established that when "the asserted claims are broad enough to cover [two embodiments], the patents must enable both embodiments." <u>Sitrick v. Dreamworks, LLC</u>, 516 F.3d 993, 1000 (Fed. Cir. 2008). Indeed, claims are held invalid for lack of enablement when they cover two distinct embodiments but only enable one. <u>Automotive Technologies v.</u>

BMW of North America, Inc., 501 F.3d 1274, 1282 (Fed. Cir. 2007). And while it is true that "every embodiment of a claim does not need to be disclosed in the specification," it is also true that "the disclosure must teach the full range of embodiments in order for the claims to be enabled." Liebel-Flarsheim v. Medrad Inc., 481 F.3d 1371, 1378 (Fed. Cir. 2007).

The other cases addressed by AMS hold that disclosing one mode of practicing the full scope of a claimed invention is sufficient for full enablement. However, this rule is subject to an important exception: if a specification discloses only one mode of carrying out an invention and conveys to persons of ordinary skill that *another* mode does *not* work, then a claim that covers that *other* mode lacks enablement. See AK Steel Corp. v. Sollac, 344 F.3d 1234, 1244-45 (Fed. Cir. 2003) (affirming a finding of invalidity for lack of enablement and explaining that "given the specification's teaching away from the subject matter that was eventually claimed and AK Steel's own failures to make and use the later claimed invention at the time of the application, the district court correctly concluded that there was no genuine issue of material fact relating to undue experimentation as it relates to enablement").

AO 72A
(Rev.8/82)

*ii. Adequate Written Description*

The written description requirement of § 112, ¶ 1 is separate and distinct from the enablement requirement. <u>Vas-Cath Inc. v. Mahurkar</u>, 935 F.2d 1555, 1563 (Fed. Cir. 1991). Its purpose goes beyond "merely explain[ing] how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention. The invention is, for purposes of the 'written description' inquiry, whatever is now claimed." <u>Id.</u> at 1563-64. Thus, "[t]he written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date." <u>Turbocare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elect. Co.</u>, 264 F.3d 1111, 1118 (Fed. Cir. 2001).

Even though the claims at issue encompass the use of a TCP networking protocol, persons of ordinary skill in the art would understand from the Original Specification that the inventors did not possess a TCP implementation of the claimed inventions. Indeed, to avoid invalidity under § 102(b) based on "version 1" of OnLine Ringman, AMS argues that the applicants had tried, but

AO 72A
(Rev.8/82)

failed, to develop a TCP embodiment of the claimed inventions when they filed

their patent application. "The purpose of the written description requirement is

to prevent an applicant from later asserting that he invented that which he did

not; the applicant for a patent is therefore required to recount his invention in

such detail that his future claims can be determined to be encompassed within

his original creation." Amgen Inc. v. Hoechst Marion Roussel Inc., 314 F.3d

1313, 1330 (Fed. Cir. 2003) (internal quotation marks omitted). "To satisfy the

written description requirement, . . . the description must clearly allow persons

of ordinary skill in the art to recognize that [the applicant] invented what is

claimed." Carnegie Mellon University v. Hoffman-La Roche, 541 F.3d 1115

(Fed. Cir. 2008) (internal quotation marks omitted). Thus the Court must

determine whether the Original Specification inherently disclosed use of the

TCP networking protocol. With regard to the issue of whether Plaintiff

provided an adequate written description of the claimed inventions in its

original specification, Plaintiff's expert Dr. Alexander states that TCP was

unsuitable for the claimed inventions and that the inventors did not possess a

TCP embodiment of the inventions when they filed their patent application.

Dep. Of Alexander, [Dkt. No. 654] at 105, 295-99.

27

Furthermore, where, as here, the patent applicant "amends his specification after the original filing date, . . . the . . . added material must find support in the original specification." Id. at 1118. "[T]he test for sufficiency of support . . . is whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." Vas-Cath Inc., 935 F.2d at 1563 (internal quotations omitted).

It is undisputed that the Original Specification did not expressly disclose that the claimed inventions could be implemented using TCP. See '612 Patent Application [Dkt. No. 572-18] Ex. 14 at MANH-061-000020. In an effort to show inherent disclosure of TCP, AMS points to a statement in the Original Specification: that "more simple networking codes may replace the RUDP implementation in future upgrades." See '612 Patent Application [Dkt. No. 572-18] Ex. 14 at MANH-061-000020. But this statement alone cannot support a reasonable conclusion that persons of ordinary skill in the art would understand the Original Specification to mean that TCP could be used to practice the claimed inventions. For purposes of clarity, the Court includes the passages below, comparing the Original Specification to the '612 patent as issued.

28

| Original Specification | '612 Patent Issued |
|---|---|
| Current networking is implemented in UDP, original versions were implemented in TCP, which was found to be too latent (3 second latencies in cases of certain packet transmission failures) in testing to date. The current UDP system re-implements most of TCP to get around this. Details of the implementation can be found in the source file "RUDP C" (which stands for reliable UDP). The main problem with this solution to date has been the complexity required in both the Bid Device (client) and Bid System. More simple networking code may replace the RUDP implementation in future upgrades.<br><br>'612 Patent Application [Dkt. No. 572-18] Ex. 14 at MANH-061-000020. | In a preferred embodiment of the present invention, the networking is implemented in UDP although other technologies could also be utilized. For instance, a TCP network could be implemented; however, the UDP network is significantly more efficient in that the latencies in data delivery are improved over TCP. Other networking techniques could also be employed and as technology advances, new techniques may be preferred.<br><br>'612 Patent at 7:64-8:8. |

First, this passage from the Original Specification does not demonstrate that the applicants possessed a TCP embodiment, even assuming that "[m]ore simple networking code" means "TCP." Second, the passage excerpted above shows that in the Original Specification, TCP was not considered to be a "more simple networking code" because TCP is specifically rejected for its latency

29

immediately preceding the discussion of more simple networking codes. The Court concludes that the Original Specification would indicate to persons of ordinary skill that the applicants did not possess the ability to make the claimed inventions using TCP. Application of the written description requirement thus serves the purpose of preventing applicants from trying to capture through broad claims that which they could not invent.

Because the record shows that the Original Specification failed to disclose use of the TCP networking protocol, the Court must conclude that the claims of the '612 patent are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, ¶ 1. Therefore, the Court shall **GRANT** Manheim's Motion for Summary Judgment of Invalidity [Dkt. No. 572] to the extent that AMS claims a TCP embodiment under the '612 patent..

**C. Auction Management Solutions' Motion for Summary Judgment Based on Non-Infringement [Dkt. No. 574]**

In this case, Plaintiff contends that Manheim has infringed Claims 1 and 2 of the '612 Patent through their use of the Simulcast system. Manheim has moved for summary judgment based on their contention that the Simulcast system does not infringe any claims of the '612 Patent.

AO 72A
(Rev.8/82)

To infringe a patent claim, a system or method must satisfy all of the limitations of the claim.  See, e.g., KCG Corp. V. Kinetic Concepts, Inc., 223 F.3d 1351, 1358 (Fed. Cir. 2000) ("Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, i.e., when 'the properly construed claim reads on the actual accused device exactly.'") (quoting Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996)).  Here, Claims 1 and 2 describe a system and a method employing bid and clerk computer systems that (1) change state only under the complete control of the auctioneer and (2) contain no time-based events.  A key element of both claims is that the auctioneer must retain complete control over all changes in the state of the auction, including the acceptance and rejection of bids.

The Simulcast system employs a bidding system with two main components: the Lane Server and the Block Client.  The Lane Server is a server computer located in Atlanta, Georgia that connects remote buyers and sellers to live auctions.  The Block Client is a computer located at the auction site operated by a Manheim employee known as the "block clerk," who enters information into the Block Client when the auctioneer accepts a bid from an

31

onsite bidder, when the auctioneer changes the price he is asking, and when an item has been sold.

In its Motion, Manheim presents three main arguments that shall be addressed individually by the Court. First, Manheim argues that Simulcast does not infringe because the auctioneer does not have complete control over the auction events. Second, Manheim claims that Simulcast does not infringe the '612 patent because Simulcast changes state in response to time-based events. Finally, Manheim urges that Simulcast does not infringe because there is no evidence that the Simulcast auctioneer exerts influence over the auction in order to draw larger bids.

### 1. An Auctioneer in Control

The Court's construction of Claims 1 and 2 of the '612 Patent makes it clear that the auctioneer in the patented system maintains complete control of the auction event, of the acceptance and rejection of bids, and of the bid and clerk computer system.

AO 72A
(Rev.8/82)

| Claim Term | Construction |
|---|---|
| "an auctioneer in control of the auction event" in the preambles of Claims 1 and 2 | "an auctioneer in control of the auction event" shall mean "an auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected" |
| "accepting an auction bid, the auction bid being accepted under the discretionary control of the auctioneer" in Claim 2 | "auction bid being accepted under the complete control of the auctioneer" |
| "the auctioneer manages the acceptance and rejection of bids" in Claim 2 | "the auctioneer has complete control over which bids are accepted and rejected" |

With regard to the acceptance and rejection of bids, under the operation of the '612 patent, a marquee screen at the auction site displays bids offered by remote bidders and leaves them in a pending state until the auctioneer decides to accept or reject them. But in the Simulcast system, the Block Client computer, not the auctioneer, is responsible for accepting bids from remote bidders. The remote bids are never submitted to the auctioneer in the Simulcast system, so the auctioneer cannot decide whether to accept or reject them. Thus, the Simulcast system does not permit the auctioneer to retain "complete control

AO 72A
(Rev.8/82)

over all changes in the state of the auction, including which bids are accepted and rejected," as both of the asserted claims of the '612 patent require.

Furthermore, the auctioneer does not have complete control over the rejection of bids because Simulcast automatically rejects certain bids from remote users, based on the bid amount. The auctioneer is not made aware that these bids were offered and rejected. The Lane Server and the Block Client computer both automatically reject certain remote bids. Because the Simulcast system automatically accepts and rejects certain remote bids without input by the auctioneer, the system does not have "an auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected" as required by Claims 1 and 2 of the '612 patent.

In an attempt to argue around this fact, AMS's auctioneering expert, Adam Alexander, defines "auctioneer" as whoever is in complete control of the auction at a given moment. However, this definition is not only circular, but it conflicts with the Court's construction of the claim term "an auctioneer in control of the auction event," which the Court has construed to mean "an auctioneer in complete control of all changes in the state of the auction." See [Dkt. No. 574-10] Ex. 5 "Rebuttal Expert Report of Infringement by Adam

AO 72A
(Rev.8/82)

Alexander on Behalf of Plaintiff AMS" at 7. Furthermore, Mr. Alexander defines "acceptance" as requiring an explicit and intentional action by the human auctioneer. Id. at 55-61. This, too, contradicts the Court's claim construction and circularly defines the terms at issue in order to avoid an unfavorable outcome for AMS.

In the Simulcast system, the Lane Server and Block Client computer both automatically reject certain remote bids that do not meet the bid amount and bids that are lower than the ask amount. The Simulcast auctioneer is not made aware that these bids were offered and rejected, nor are any other bidders or observers of the auction. Because the system automatically accepts and rejects certain remote bids without input by the auctioneer, the system does not have "an auctioneer in complete control of all changes in the state of the auction, including which bids are accepted and rejected."

The Simulcast System also does not infringe Claims 1 and 2 because the auctioneer does not maintain complete control over the changes in the state of the computer system. Claims 1 and 2 require that this complete control exist in the auctioneer; however, the automated responses of the Simulcast servers when they accept and reject bids based on set criteria mean that the Simulcast

auctioneer does not, in fact, maintain complete control over the computer system.  For these reasons, the Court concludes that the Simulcast auctioneer does not maintain complete control over the auction events, as required by the '612 Patent.

### 2. An Event-Driven System

The limitations in Claims 1 and 2 of the '612 Patent demonstrate that the system described by the patent is an event-driven system, *not* a time-based system.

| Claim Term | Construction |
|---|---|
| "event-driven system" in Claim 1 | "computer systems that change states in response to the occurrence of a triggering external event" |
| "performed in accordance with . . . event-only based events" in Claim 2 | "the steps of the method are performed with computer systems that change states only when prompted by the occurrence of a triggering external event" |
| "Non-time based events" in Claims 1 and 2 | "changing states when prompted by events that are not based on time and excluding the use of delays, buffers, and time windows to control bid acceptances in order to control the amount of processing" |

| "Occurring under the direction fo the auctioneer" in Claims 1 and 2 | "occurring under the complete control of the auctioneer" |
| --- | --- |

Claim 1 requires a system that is event-driven - one that does not operate based on events triggered by time. Instead, it requires that an auctioneer manage the pace of the auction. Claim 2, a method claim, also requires non-time-based events and an auctioneer who manages the pace and the psychology of the auction. Claim 2 also requires that bids be accepted under the discretion of the auctioneer, who maintains complete control over such acceptance.

During the prosecution of the '612 patent, AMS argued that its claimed inventions were "unique and innovative" because they were not "time-based system[s]" but rather were "event-driven systems." See MANH-061-000563, at -569 (April 21, 2004, Amendment and Response After Final); MANH-061-000597, at -601 to -602 (Notice of Allowability). Their system was innovative because of their invention of the system changing state only to reflect an action taken by the auctioneer - not to reflect when other automated time-driven events might occur. AMS explains that "[t]he core characteristic of an event-based system is that it is not subject to the occurrence of time-based events. In fact,

unless a non-time-based event occurs . . . , the system will not change state. It simply remains in the current state." Id.

The Court concludes that the automatic acceptance of a remote bid clearly constitutes a change in the state of the computer system, and as described above, such a change can occur without any action by the auctioneer. Such a change of state in the Simulcast computer system is displayed to onsite and remote participants, and it is also recorded on a log at the Lane Server. The undisputed evidence establishes that an auctioneer does not have complete control over changes in the state of the computer system during Simulcast auctions and that no infringement is taking place in this regard.

Claims 1 and 2 further require that a system not include any events causing the computer system to change states due simply to the passage of time. The Simulcast system, however, includes time-based events.

One example of the Simulcast system's time-based operation is proxy bidding. This feature submits bids on behalf of bidders who cannot attend the auction in person or remotely. When the Lane Server receives a message from the Block Client setting a new ask price and two criteria are met - (1) the ask price is below the maximum set by the proxy bidder and (2) the proxy bidder

AO 72A
(Rev.8/82)

did not submit the current high bid - a timer starts at the Lane Server. After the Lane Server waits for the prescribed period of time after a bid is accepted to transmit a subbid to the Block Client for automatic acceptance. This time interval is a time-based event, and the auction and computer system change state when the bid is automatically accepted by the Block Client following the prescribed time period. Thus, the Court concludes that infringement of Claims 1 and 2 cannot occur whenever proxy bidding is being used.

AMS and its expert Dr. Alexander contend that these time intervals are not time-based events because the submission of a proxy bid is prompted by a non-time-based event. However, the Court disagrees with this argument and notes that virtually no event in an auction could ever constitute a time-based event if such an interpretation were to be adopted. Under AMS's construction, even an auctioneer hitting a button to start a timer could be construed as a non-time-based event since the auctioneer's action (a non-time-based event) initiated all timed events that followed it. The Court must conclude that the time interval in submitting the bid is a time-based event resulting in a change in the computer system. The Simulcast system does not satisfy the non-time-based event limitations of Claims 1 and 2 of the '612 patent.

AO 72A
(Rev.8/82)

## 3. An Auctioneer Drawing Larger Bids

Finally, the '612 Patent requires that the auctioneer manage the psychology and pace of the auction. The Court's construction of the claim terms makes it clear that AMS's intent was for the auctioneer to use techniques to make bids on items larger than they otherwise may be.

| Claim Term | Construction |
|---|---|
| "the auctioneer manages the psychology and pace of the auction" in Claim 1<br><br>"the auctioneer manages . . .the pace of the auction and the psychology of the auction" in Claim 2 | "the auctioneer uses a variety of techniques to exert influence over the emotion, enthusiasm, and excitement of remote and onsite bidders and over the speed of bidding to play bidders off each other so that they are more likely to bid on auction items and make larger bids" |

But beyond their own expert's bare opinion, AMS offers no evidence that the Simulcast system satisfies the limitations in Claims 1 and 2 requiring that the auctioneer manage the psychology and pace of the auction, using techniques to draw larger bids. The Court noted during the Markman hearing that empirical evidence of this element could be shown because successfully exerting influence over the auctions would result in a greater likelihood that bidders would compete for auction items and make larger bids. AMS has failed to

convince the Court based on the record at hand that the Simulcast system meets this element in any way. There is no evidence in the record to support Dr. Alexander's bald assertion that Simulcast meets this element, and the Court concludes that AMS cannot show that the Simulcast system satisfies these limitations of Claims 1 and 2.

In conclusion, the Court shall **GRANT** Manheim's Motion for Summary Judgment of Non-Infringement [Dkt. No. 574].

### D. LGB's Motion for Summary Judgment [Dkt. No. 562]

Before its dismissal from the case, Live Global Bid, Inc. (hereinafter "LGB") submitted a Motion for Summary Judgment [Dkt. No. 562], arguing that there was no inducement of infringement based on any direct infringement by Manheim in this case. When LGB left the litigation, Manheim joined in this Motion for Summary Judgment. See Notice of Manheim's Joinder [Dkt. No. 580]. In light of the foregoing rulings, the Court shall **DENY the Motion as moot**.

### III. Conclusion

In conclusion Defendant LGB's Motion for Summary Judgment of No Inducement of Infringement Based on Any Direct Infringement by Manheim

AO 72A
(Rev.8/82)

[562] is hereby **DENIED as moot**, Defendant Manheim's Motion for Summary

Judgment [572] is hereby **GRANTED**, Plaintiff Auction Management

Solutions' Motion for Summary Judgment [574] is hereby **GRANTED**, and

Defendant Manheim's Motion for Summary Judgement of Invalidity of AMS's

'612 Patent Under 35 U.S.C. § 102(b) and Unenforceability of AMS'S '612

Patent Due to Inequitable Conduct [602] is hereby **GRANTED**.

       **SO ORDERED**, this   24th   day of March, 2009.

**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)